Good morning. This case, the facts would be simply stated, Black Diamond delivered $10 million of coal to Commodities. Commodities doesn't want to pay for that coal. The invoices have been assigned to CIT. And the Bankruptcy Court basically addressed two issues which we believe were critical error. The first issue is, can Commodities claim a right of set-off as a valid defense to paying the invoices for damages that they say accrued later after assignment of the invoices under New York law? And particularly we look at New York Section 9 404A1. The second issue is, do they have a valid right of set-off under the contract where we claim they were the first breaching party? Now the baseline rule in New York, and this is where the bankruptcy judge got it wrong, the baseline rule in New York is, and I'm quoting from the Greyhound case cited in our papers, it is settled that a claim in the nature of set-off against Plaintiff's Asinore may not be interposed as a counterclaim against the Asinie unless the counterclaim was actually due at the time of the assignment. Here we had an assignment of invoices, and the bankruptcy judge correctly found that the time of the assignment of the invoices for the coal, there was no set-off possible. There was no obligations which Black Diamond owed to Commodities. They accrued later. So the baseline rule in New York is that a later accruing set-off cannot be used as a defense against the Asinie. That's the baseline rule. Now, Section 9404A1 of the Uniform Commercial Code makes the Asinie essentially a liable, as a defense, for the terms of the contract. So Section 16 of the underlying coal supply agreements, which we reproduce the relevant language on page 35, provides that there is a right of set-off. The parties can offset mutual obligations. However, again, in New York, under New York law, which the bankruptcy judge did not analyze, under New York law, New York law has a rule of explicitness. In order to contract around the baseline rule that you can't set off later accruing damages after the assignment of the invoices, the underlying contract has to specifically say, to get around the baseline rule, they have a right of set-off for future amounts, for unmatured amounts, for contingent amounts. This contract does not have that language in it. Pretty close, though. It's close, but if you look at the New York cases, including one that— If you look at this language, I mean, we're just talking about this language, all amounts owed, right? That's the key sentence? Yes, but, Your Honor— Including any related interest or other amounts shall be netted. But in the Bank of Meridian case versus the North American Mortgage case, we had a dichotomy. In one case, the Southern District of New York District Court, where there was language that said future obligations, unmatured obligations, contingent obligations could be offset, said that's fine. But in the North American Mortgage case, where there wasn't that language, where you had language that was similar to this contract, the court said no. And by analogy, in the Credit Alliance case, albeit not under New York law, but the same principle was applied. The contract didn't say future, contingent, unmatured, and the court said no. You don't have a right to set off future obligations, and there's a very practical reason why. Section 9404A1 is there to encourage factoring, to encourage the assignment of accounts receivable, to encourage lending against them. The ASINOR, here CIT, has the right to be able to look at the assigned invoices, make inquiries, is there some defense that's available here? You can't do that if there's some later occurring accruing defense, unless the parties specifically contract for it. Now, the bankruptcy judge did not analyze 9404A1, did not analyze the New York cases. The bankruptcy judge relied on the general principle of NEMO DOT. Do you agree that the whole issue is whether this language sufficiently preserves those defenses? Under 9404A1, yes, but there's another issue here. And again, but we have to, again, New York law, it's not, New York law doesn't simply say you can contract with whatever you want. New York law says you have to be very specific. You have to be very specific in saying that you want to preserve... You have to be very specific, so we just look at this and see how specific it is, right? Correct, but we... The thing it has to have magic words of futurity, is that basically the argument? And that's what the cases hold, Your Honor, yes. You have to have words of future. Yes, we look at the holdings... Any can include the future unless it says any including the future. Is that basically the argument? Yes, because there are cases that have said exactly that. Let me get at it. There's not another argument. I mean, that's basically the argument here, right? That's this particular argument, yes. There is a separate recoupment point. The bankruptcy judge said, well, you can recoup, and 9404A1 also preserves rights of recoupment. But again, the New York doctrine of recoupment is very narrow. It doesn't allow you to recoup against one particular sale. If you lose on this first one, then you lose. Sorry, what's that, Your Honor? If you lose on this first one, that's just another argument that they're raising against you. Correct. If you lose on this one, then that's dispositive of the appeal. Of the 9404A1 issue, no, not dispositive of the appeal. Because our second issue is that under the contract, section 12B of the contract does not permit them to do what they did here. That's a different issue. They didn't pay the December invoices on time. We say the December invoices were due on January 21 of 2008. They did not pay them on time. They waited, and then, we say they breached first. Then they waited, and then they say, oh, we don't have to pay those invoices now because now that Black Diamond is filed for bankruptcy, we have damages, and we can offset. Just so my mind is clear, those are two entirely distinct arguments. Yes, Judge. Yes, Judge Rogers. We went on either one of them. Either one of those two you went on. Correct. But on the very first argument, Judge Rogers, because it seems to be troubling, Your Honor, the cases illustrate language that works and language that doesn't. In the case that was decided by then, District Judge Sotomayor, you had specific language that said unmatured, contingent future obligations can be offset against current obligations. You had that in the documents. In the second case that we cite, the North American mortgage case, there was language that was basically the same as this contract. It just said you have the right to offset. And there, the District Judge said not good enough under New York law. And again, the credit alliance, and again, there's a policy behind this. It makes practical sense. If somebody is going to rely, like CIT is going to rely on the invoices when it takes assignment of them, to make the whole process work, to make the accounts factoring process work, you should be able to look at the face of the invoices. You should be able to look at the contractual agreements between the parties and figure out what your risks are. You can look at the language, and you can see New York law has a rule of explicitness. If you want to be able to offset future amounts, that has to be explicit. How would you know that there are past amounts that are due from looking at an invoice? I mean, these people had a relationship that was going back and forth. Correct, Judge White. But then you can inquire. At the time you take assignment, you do what CIT did in this case. They went to Black Diamond and said, tell us what's going on, facts and circumstances, any problems? No. They went to commodities. Do you agree with these invoices? Is there any offset, anything like that? No. So then they take the assignment. So you look at the documents. They did that for every invoice? Every invoice. They confirmed with commodities. Every invoice. They confirmed with commodities, you know, do you have the invoices? Is this correct? That's what notification financing like this is about. They also asked whether they had any set-offs. They inquired about all the facts and circumstances, Judge White. That's what they do when they underwrite these invoices. They get the invoices, and they make an extension of credit on the basis of the invoices. They ask questions. They can inquire if they have any questions. What they can't anticipate and what they can't underwrite, what they can't account for, is what happened in this case. Where, again, the bankruptcy judge found, as a matter of fact, it's not disputed, at the time of the assignment of the invoices, there was no right of set-off. None whatsoever. It accrued later. What they can anticipate is that somebody like commodities will not pay for it, wait for a period of time, then claim its own breach and then say, ah, we can offset those future damages against these prior invoices. When did Black Diamond stop paying for the coal they were getting from commodities? Those were the book-out transactions. Those were all netted before we actually got to the invoice stage. So sometimes, because Black Diamond and commodities, it wasn't just a one-way street. Sometimes Black Diamond was selling coal to commodities, and sometimes commodities was basically reselling coal back to Black Diamond. Those would be adjusted, and then an invoice for the net amount would be what would result. So we didn't have a problem with that here, Your Honor, to offset these $10 million worth of invoices. What they're seeking to offset against the $10 million worth of invoices is the latter accruing damages. Okay, so the only thing they're trying to offset is the cover damages, in effect. The cover damages, right. They claim that they cost them more money out there to get coal. Whether they had any losses or not, we don't know. But we do know they got the delivery of the $10 million of coal, and they don't want to pay for it. And they're asserting this as a defense. And the question is, under New York law, which the bankruptcy judge didn't analyze, the bankruptcy judge again said, NEMO DOT, that's the concept. The ASINEE never gets more than the ASINOR. That's not New York law. That's not Section 9404A1, particularly in New York. The concept of recoupment doesn't cover them. It's much narrower. Under recoupment, you can only get set off with respect to particular sales. You can't say, oh, we had a bunch of sales under this contract. We can set off damages relating to one against obligations we owe under the other. That's the Westinghouse case from the Second Circuit. It makes that very clear. Again, the bankruptcy judge didn't analyze that, didn't do it, didn't look at New York law. He used general principles to say that they win. We say it's de novo review. That's reversible error. I'd like to reserve the rest of my time for rebuttal, if I may. Thank you, Your Honor. Good morning, Your Honors. Claude Zipher from Stricken, Stricken, Levin on behalf of Constellation Commodities. And let me address a couple of points right off the bat that I think are on the judge's minds and that Mr. Brunstad addressed. He said that a party should be able to account for the contract terms and a party should be able to account for those at the inception of the relationship. Well, Mr. Franklin, who is CIT's in-house counsel, did exactly that. And I would address the court to DE 117-6, which is Exhibit 22, and allow me to read from a couple of e-mails. And these are Mr. Franklin's. Those aren't binding on him. Those are just evaluations, aren't they? No, but what they show are exactly what Mr. Brunstad is saying, that an account So he had some people on his side who agreed with your theory rather than his theory. But that doesn't prove the theory, does it? No, but it does, Your Honor, because what You just proved the theory rather than saying at one point one of their lawyers had agreed with you? No, no, no, Your Honor. What they could have done was gotten a subordination agreement or an intercreditor agreement. They had the opportunity to do that at the inception. Mr. Franklin looked at the coal supply agreements specifically and said, quote, Any chance that Semper and Constellation would agree to limit their rights to set off against CIT, CMS? I would guess not, but it cannot hurt to ask. That was on April 14th, 2006, right before the first coal supply agreement was executed. Secondly, another email on May 3rd, Mr. I for one am not relying one way or the other on those emails, so I don't know about my fellow counsel. Maybe you could go on to the main point. Sure, sure. Absolutely, Your Honor. And your opposing counsel points to this language, which he's quoted on page 35 of his brief, but it's the netting provision. That's right, and it is. And if the netting provision doesn't apply, then you have a hard time in this case. And if it does apply, they more or less can see that you win, at least on that independent issue, right? And it does apply, Your Honor. It does apply. Well, I've got it here before me. I'm assuming it's in hot verba with the actual language. That's right. And it seems sweeping, but it doesn't seem future. So he says some cases require language of futurity. Is that argument making sense? It doesn't make sense because Mr. Brunstad. It's coherent, though. We understand what he's arguing. Right. Okay, what's wrong with the argument? He says the cases require language of futurity. Do they require that or not? No, they don't, but also it's wrong factually here because Mr. Brunstad makes a very critical mistake. He says that we're only trying to net, set off, or recoup the termination damages, but that's wrong. In January of 2008, we sent an invoice to Black Diamond, $1,045,000, for a book-out invoice that was not paid by Black Diamond. We delivered coal to Black Diamond in January 2008. At the time of the assignation or the assignment? Prior to that. At the time of the assignment, this set-off was available? Yes, absolutely, because of the application. Is that necessary to your case? We can figure that out. Your case depends on the fact that it was something that could have been asserted at the time of the assignment? No, the timing doesn't matter, and why? All right. If it doesn't matter, then you get to the language of this provision. That's right, but the timing doesn't matter. When you get the language of the provision, what do you do with the cases they cite which say that this language isn't specific enough, they say? The language is specific enough. What do you do with the cases, is my question. What I do with the cases is simple, Your Honor. Those cases are distinguishable. For example, the North American mortgage case that Mr. Brunstad relies upon specifically had contingent liabilities. Those contingent liabilities that they were trying to offset were lawsuits that were just going on. There was no judgment in those lawsuits. Here, commodities had matured obligations, and again, let me address those. You're going back to the factual difference then. But they're also a legal difference because… A minute ago you said the timing didn't make any difference. Well, the timing of the accrual of my defense doesn't make a difference, and that's because of the application of 9404A1. The official comment to 9404A1 says explicitly, Your Honor, that, quote, it makes no difference whether the defense or claim accrues before or after the account debtor is notified of the assignment. So when I'm notified of the assignment is irrelevant. Why? Because my defenses are under my contract, Section 16, and therefore I have those defenses. The defenses are under the contract by virtue of the netting agreement, right? That's right. So whether you have the defense depends on whether the netting agreement applies to them, right? And the netting agreement does apply because it applies… I'm interpreting them to rely on cases which say that it doesn't. Right, but those cases, as I said, are distinguishable because those cases, there were unmatured obligations. Here, all of the obligations that commodities seeks to net, set off, and recoup are all matured obligations. And, again, I focus upon 10.3 million in obligations that accrued in January and February, all prior to the termination, all prior to when commodities terminated the contracts. This stuff is hard for me, but I just see a tension between saying that the timing doesn't matter, but we win because of the timing. That's what it sounds like. No. Where am I hearing wrong? You say the timing doesn't matter, but this language doesn't apply because of the timing. Because I have amounts that I can net, set off, and recoup before the termination as well as after the termination. Because this language says that you can do both. I can do both. All amounts owed, and then the fourth sentence says all payment obligations. Including future ones. Exactly right. And in the second sentence… It doesn't say including future ones. That's what I'm gathering. I may be wrong. That's what I'm gathering is the crux of this issue is whether this language here actually includes that. And it does, because if you look at the second sentence, the second sentence actually contemplates interest. I can set off a net interest. Interest is going to accrue in the future. Okay. Some indication that it applies to future damages. That's right. There is no law of explicitness that Mr. Brunstad has set forth. What it is is basically a contract interpretation. Is the contract clear or not? And here the contract is very clear. That it says that all amounts owed. Owed means do you owe it? The fourth sentence says all payment obligations. The termination damages and the $10.3 million in book out invoices, liquidated damages, and unpaid invoices by Black Diamond, those are all payment obligations. So all of those can be netted, set off, or accrued by commodities. Do you agree if this language wasn't there you would lose on this issue? You just didn't have this netting provision? Well, if the netting provision was there, I think I would have a harder time, because then I would have to go to common law rights. But this provision sets forth much more than what the common law sets forth. Yes? So if you had just thrown them into bankruptcy sooner? Ah, but we did not, Your Honor. We did not. It was actually CIT. And that's part of what's wrong with their argument here is they're saying that we waited. In their papers they say, ah, if you allow the netting and set off here, you'll be encouraging wait and see set off. And that's not what happened here. What happened was we had $10.3 million in the January and February misdeliveries and the book out invoices. Those accrued even before the bankruptcy. Let me just ask you a question. Sure. The $10.3 million in January. And February, right. And February. Was that based on their purchases from you that weren't paid for? Or are these cover damages? No, they're based on invoices for book outs. Book out is a financial settlement of offsetting deliveries. They're based on $2.7 million in misdeliveries. And I would address the court to doc number 118-1, where there's a February 7, 2008 invoice for $2.8 million. So that was coal that commodities sent to Black Diamond that Black Diamond never paid for. And then in February, Black Diamond failed to deliver $5.8 million worth of coal. And there was another February book out invoice for $550,000 that they also didn't pay. And that, though, is basically your cover damages, right? Well, they're cover damages in the sense that my damages are at least for the difference between contract and market. So they are. But they're not the termination damages. This had to do with one of the regular set-offs. Exactly. And all of that adds up to $10 million? That adds up to $10.3 million. And that alone wipes out the $9.98 million. Right. Now, did the bankruptcy court make that observation? That's what I thought the facts were. That's right. And then counsel said that, no, it's all later damages. No, and it's not. And that's why it's so important. Our proof of claim was explicit. We included the termination damages, and we included the misdeliveries, the January and February book out invoices, and the January and February liquidated damages. Okay. But, again, did the bankruptcy court make an observation that in any way they offset each other or anything like that? I don't know. I don't believe that the bankruptcy court made that specific finding because the bankruptcy court said there's well over $9.98 million here to net set-off and recoup, and that's what happened. So that's right. Turning to the issue of whether or not we breached, one, we didn't breach. The invoices for the December transactions were due on February 22nd. We made that point clear to Black Diamond, and Black Diamond then made that point clear to CIT. That's not the basis for the lower court's opinion, though. Well, what the court said was the bankruptcy court in particular said that the February 19th date cut off. The district court. The district court actually never reached the issue. The district court didn't rely on that. It relied on something else. That's right. That's right, Your Honor. But just to address the issue, we didn't breach. In particular, the December invoices total $417,000 that they say we did not pay on January 21st. On January 18th, we sent an invoice for the $1,045,000 on the January book-out invoice. We sent that to Black Diamond. That $1,045,000, if somebody would have said we were in default or we had a problem, we would have netted that $1,045,000 against the $417,000, which more than erases that. So there isn't a default, and there wasn't a cross-default. Did you address the argument that the district court made? Not defending that? The district court with respect to? You said they didn't reach this because they had another reason to rule for you. Well, yeah. The district court basically said that Black Diamond never did anything. It's basically that Black Diamond waived. One. You don't want to defend that argument? Oh, I do defend that argument. Of course. I mean, again, the facts are clear. One, that even after the January 21st date came and went, Black Diamond delivered over $4 million worth of invoices of coal to commodities. Two, Black Diamond never said that we were in default. Three, Black Diamond never terminated the contracts, and this was the holding of the district court. District court said that it's undisputed that Black Diamond never terminated, never claimed we were in default, and therefore did nothing, and they waived their rights to allege some cross-default under the agreements. And importantly, CIT ended their assignment on February 11th. They terminated their rights to say anything in this on February 11th, 2008, and therefore had no standing to say, ah, there is an event of default or not. They voluntarily terminated their own rights. So Black Diamond waived any event of default. And importantly, another key, key fact here is the contract under 12B requires a party to act. Under 12B, if you think there's an event of default, you do one of two things. Either one, you suspend, and there was no suspension here, and the record demonstrates there was no suspension, and you can suspend for only 60 days. Or two, you terminate the contract. Black Diamond did neither of those. Now CIT in their paper says, ah, well, Black Diamond didn't suspend because they didn't know about the default until February 5th, but that argument is irrelevant because after February 5th, Black Diamond still did nothing. And then I think the most important fact is that even during the bankruptcy, even during Black Diamond's bankruptcy, they never challenged commodities termination. Black Diamond never said, hey, you filed a $93 million claim against us, but you're wrong because you didn't have the right to terminate. You can't file a claim against us because you were in breach and you were in default. Black Diamond never did that. We have a claim in their bankruptcy. Granted, we're getting pennies on the dollar, and that's what we got because Black Diamond liquidated.  And you guys committed something that was a terminable offense. And let me finish with one point, Your Honor. This case is not a windfall for commodities, okay? We are out over $90 million worth of coal that was at very favorable prices to us. We didn't really want to terminate these contracts. The price of these contracts was $50 a ton, $52 a ton. The reason why we have $93 million in termination damages is because the price of coal spiked to $83, $84 a ton. Thus, when we terminated, we had to go and cover that coal. These contracts were beneficial to us. They were contracts that we wanted to keep in place, but once we knew that Black Diamond wasn't going to continue to deliver and once we knew they were in bankruptcy, we had no other choice but to terminate. Thank you, counsel. I think it's vital to clarify a factual piece that needs to be stated. Counsel, in his claims of offsetting damages, is fighting a finding of the bankruptcy court that he, in fact, agreed to below. And that's reproduced on page 20 of our brief. I just want to quote it because I think it clears the whole thing up. At the time commodities acquired the coal, sold pursuant to the invoices and un-invoiced deliveries, no money was owed by Black Diamond to commodities. This is, I'm quoting, the bankruptcy judge's finding. The termination and liquidation damages suffered by commodities accrued after Black Diamond transferred title to the coal to commodities and after the commencement of Black Diamond's involuntary bankruptcy case. The bankruptcy court said nothing was owed by Black Diamond to commodities. There was no right of set-off at the time the invoices were assigned or even up until the point when Black Diamond was in bankruptcy. So all these claims about offsetting amounts and things like that are contrary to the finding of the bankruptcy court. And I think on appeal, that's what we're stuck with. What they say on page 30 of their brief is also contrary to what they're saying now. What they say on page 30 of their brief is that all of the damages they're claiming as offsets were due at the time they exercised their rights. And that, of course, is also after the bankruptcy. Now, I think it's important to contrast the language in the Bank of Meridian case. In the Bank of Meridian case, their then district judge, Sotomayor, addressed language and she quoted it. And the language, the set-off language there, all of Meridian International's present and future obligations and liabilities of whatever nature, whether matured or unmatured, absolute or contingent, that's the language in the agreement in the Bank of Meridian case. In the North American case, their judge Haight, the district judge, said, hey, look, this is totally different from the case that was before then district judge Sotomayor. We have none of that future language in our case. It doesn't satisfy the criteria. So we had two different results that turned entirely on the two different languages. So which case is this like? This is just like North American. It is completely unlike the Bank of Meridian case. They did not contractually preserve the right to offset against future damages. And the Credit Alliance case applies the same principle. Now, the Greyhound case that we cite from the state court in New York says, point blank, again, the baseline rule. You cannot offset future damages against an invoice. And there again you had an invoice that had been assigned to CIT. That was one of CIT's cases. It was a factor in that case as well. CIT prevailed. So their argument is not factually squared with the record. It doesn't follow what the bankruptcy judge actually found factually. And their distinguishing these cases doesn't work because the cases actually in principle apply. Now, our argument under the contract, looking at the contract, is very straightforward. It focuses on Section 12B of the coal supply agreements. And 12B says, if they were the first party to breach, and that's a disputed fact. Judge Lee refused to decide that question. He said there's all kinds of facts. He said it doesn't matter. But we say it does matter. And so if your honors agree with us, then there will have to be a remand on that second issue and to have this finding a fact of who breached first. But we say it does matter because if you look at Section 12B of the contract, it is a classic prohibition against opportunistic defaults. You cannot, under Section 12B, default by failing to pay some invoices, then wait, and then say, oh, now the contracts are all terminated. We now have cover damages. We're using that to wipe out our obligation to pay. That's exactly what 12B provides. That's exactly the gist of 12B. And what basically happened below is Judge Lee had a hyper-literal technical examination of the contract. He said their failure to pay the invoices was not a breach because the invoices were under oral agreements, and although there's a cross-default provision in the coal supply agreements that makes a breach of some other obligation in coal a cross-default that would trigger 12B, that doesn't apply here. Why? Because Judge Lee did something highly implausible. He said the parties didn't intend that failure to pay invoices would constitute a breach. Now, I respectfully submit that's not only highly implausible, that's contrary to the terms of this agreement. Not what the district court relied on, though. The district court did not rely on that precisely. But again, this is a quirky bankruptcy appeal where you have an intermediate appellate court, the district court intermediate appellate decision drops out under this court's precedence, and we review what the bankruptcy court did directly. I have a misreading of our precedence, but a lot of people misread it that way. I'm sorry, Judge Rogers. But I think that the correct analysis. If it's legal analysis, we can use it if it's based on the record. Correct, Your Honor. Even if it doesn't drop out somehow. That's correct, Your Honor. That is correct, Your Honor. And again, the correct standard of review here is de novo. I'm not criticizing you. That's what's normally done. They go straight to the bankruptcy opinion, but we have these interim levels for a reason. I mean, but go ahead. But I think the critical point from Your Honor's comments is that it is de novo review on both. It's de novo review, did the lower courts, one or both of them, get New York law right? And neither of them analyzed 9404A1 or the New York cases or the rule of explicitness. And de novo, did either of the lower courts get the contract interpretation right? This court is in just as good a position to look at the contracts given the bankruptcy judge's findings. But again, there is a missing finding. The bankruptcy court refused to say who breached first, whether they breached. Thank you, Counsel. Thank you, Your Honor. The case is challenging. We'll do our best. The case will be submitted. Please call the next case.